## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

_____

COMMONWEALTH OF MASSACHUSETTS,

         Plaintiff,

     v.

3M COMPANY; AGC CHEMICALS
AMERICAS, INC.; ARCHROMA U.S., INC.;
ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT
COMPANY; CHEMGUARD, INC.; CLARIANT
CORPORATION; CORTEVA, INC.;
DUPONT DE NEMOURS, INC.;
DYNAX CORPORATION; E.I. DU PONT DE
NEMOURS AND COMPANY; KIDDE-FENWAL,
INC.; NATIONAL FOAM, INC.;
THE CHEMOURS COMPANY; TYCO FIRE
PRODUCTS LP; and ABC CORPORATIONS 1-10
(Names Fictitious),

         Defendants.

_____

MDL NO. 2873

Master Docket No.: 2:18-mn-2873

JUDGE RICHARD GERGEL
Civil Action No.  2:22-cv-01649-RMG

**COMPLAINT WITH JURY
DEMAND**

## <u>INTRODUCTION</u>

1.    For many years, Defendants have understood the dangers of toxic per- and polyfluoroalkyl substances, including perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluoroheptanoic acid ("PFHpA"), and perfluorodecanoic acid ("PFDA") (collectively, "PFAS"[1]), including the PFAS in aqueous film-forming foam ("AFFF") used for firefighting training and emergency response at military and industrial facilities, airports, and other locations throughout the Commonwealth of Massachusetts ("Commonwealth" or "Massachusetts").

---

[1] "PFAS," as defined here, also includes all PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA salts and ionic states as well as the acid forms of the molecules and their chemical precursors.

Nevertheless, long after they became aware of these dangers, Defendants continued to advertise, market, manufacture for sale, offer for sale, and sell PFAS-containing AFFF (collectively, "AFFF Products") to, *inter alia*, the Commonwealth's governmental entities, counties, municipalities, local fire departments, businesses, entities, and residents.

2.      These tortious and unlawfully deceptive actions have caused and/or contributed to the PFAS contamination of the Commonwealth's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the Commonwealth. These toxic and persistent "forever chemicals" are contaminating countless water supplies and requiring massive efforts and expenditures of funds to investigate, treat, and remediate the contamination of the Commonwealth's natural resources, property held in trust, and/or property otherwise owned by the Commonwealth and to supply potable water to large numbers of people in the Commonwealth.

3.      Defendants are responsible for this contamination in the Commonwealth. Presently, several locations in the Commonwealth have been identified as being contaminated with PFAS. For example, 126 drinking water systems in 86 communities have been found to have elevated levels of PFAS, with many of these systems showing PFAS levels hundreds to thousands times higher than the Commonwealth's Maximum Contaminant Level of 20 nanograms per litter ("ng/L"), or parts per trillion ("ppt"), individually or combined, for six specified PFAS (hereafter, "PFAS6 MCL"). Illustrative of this contamination, the PFAS contamination levels in soil at Westover Air Reserve Base in Chicopee have reached 360,000 ppt. At the former Naval Air Station South Weymouth in Weymouth, Abington and Rockland, the PFAS contamination levels in groundwater have reached 330,000 ppt—*some 16,500 times the PFAS6 MCL*. Other examples include, but are not limited to, Hanscom Field/Air Force Base, Joint Base Cape Cod, and Stow's

Former Fire Station.[2] As investigation continues, more PFAS contamination due to AFFF Products in the Commonwealth will be uncovered.

4.      The Commonwealth, by and through its Attorney General ("Attorney General"), brings this action pursuant to the Commonwealth's statutory and regulatory authority and common law for injuries to Massachusetts's natural resources, property, residents, and consumers against Defendants 3M Company ("3M"); AGC Chemical Americas, Inc. ("AGC Chemicals"); Archroma U.S., Inc. ("Archroma"); Arkema, Inc. ("Arkema"); Buckeye Fire Equipment Company ("Buckeye"); Chemguard, Inc. ("Chemguard"); Clarinet Corporation ("Clariant"); Dynax Corporation ("Dynax"); E. I. du Pont de Nemours and Company ("Old DuPont"); Kidde-Fenwal, Inc. ("Kidde-Fenwal"); National Foam, Inc. ("National Foam"); The Chemours Company ("Chemours"); and Tyco Fire Products LP ("Tyco") (collectively, "Manufacturer Defendants"); and Corteva, Inc. ("Corteva"); DuPont de Nemours, Inc. ("New DuPont"); and ABC Corporations 1-10 (Names Fictitious) (collectively with Manufacturer Defendants, "Defendants").

## JURISDICTION AND VENUE

5.      Proper venue for this case is the U.S. District Court for the District of Massachusetts. 28 U.S.C. § 1391.

6.      The U.S. District Court for the District of Massachusetts has subject matter jurisdiction over this case because it raises a federal question pursuant to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-27 ("SDWA"). 28 U.S.C. § 1331. The U.S. District Court for the District of Massachusetts has supplemental jurisdiction over the other claims raised in this Complaint. 28 U.S.C. § 1367(a).

---

[2] In this action, the Commonwealth excludes and does not seek to recover damages properly sought by local governments and/or public water systems that have filed suit for PFAS contamination within their jurisdiction, as of the date of the filing of this suit.

7.     The U.S. District Court for the District of Massachusetts has personal jurisdiction over Defendants pursuant to the U.S. and Massachusetts Constitutions and the Massachusetts long-arm statute, M.G.L. c. 223A, § 3, because, as set forth in detail below, each Defendant transacts business and/or causes harm in the Commonwealth, and the causes of action arise out of and relate to each Defendant's business and/or harms that Defendants are causing in the Commonwealth.

8.     Pursuant to Paragraphs 25-29 of Case Management Order No. 3 in *In re Aqueous Film-Forming Foams (AFFF) Products Liability Litigation*, MDL No. 2873, in the U.S. District Court for the District of South Carolina, Charleston Division ("AFFF MDL"), the Commonwealth files this case directly in the AFFF MDL in the U.S. District Court for the District of South Carolina and expressly identifies the U.S. District Court for the District of Massachusetts as its home venue and respectfully requests that its case be sent back to that jurisdiction for trial and other post-pretrial matters.

## **PARTIES**

9.     The Plaintiff is the Commonwealth of Massachusetts represented by the Attorney General. The Commonwealth acts in its sovereign and *parens patriae* capacity and in the public trust to protect and promote the Commonwealth's interests, including its interest in the health, safety, security, and well-being of its residents and the integrity of its natural resources. M.G.L. c. 12, § 10.

10.    The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the relief requested herein pursuant to M.G.L. c. 12, §§ 3, 5, 7, and 11D; M.G.L. c. 93A, § 4; M.G.L. c. 109A; and M.G.L. c. 111, § 160.

11.    Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-

1000. 3M has designed, manufactured, marketed, and sold PFAS-containing AFFF used in the Commonwealth.

12.     Defendant AGC Chemicals is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, and sold fluorochemicals containing PFAS used to manufacture AFFF that was used in the Commonwealth. Fluorochemicals are organic compounds containing fluorine used in the manufacture of surfactants.

13.     Defendant Archroma U.S., Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 543577 Center Dr., #10, Charlotte, North Carolina 28217. Archroma U.S., Inc., a subsidiary of Archroma Management, LLC, has designed, manufactured, marketed, and sold fluorochemicals containing PFAS used to manufacture AFFF that was used in the Commonwealth.

14.     Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was used in the Commonwealth.

15.     Defendant Buckeye Fire Equipment Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110

Kings Road, Kings Mountain, North Carolina 28086. Buckeye has designed, manufactured, marketed, and sold PFAS-containing AFFF used in the Commonwealth.

16.     Defendant Chemguard, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard has designed, manufactured, marketed, and sold AFFF containing PFAS that was used in the Commonwealth. Further, Chemguard has designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was used in the Commonwealth.

17.     Defendant Clariant Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant has designed, manufactured, marketed, and sold fluorochemicals containing PFAS used to manufacture AFFF that was used in the Commonwealth.

18.     Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805. In 2019, New DuPont (defined *infra*) spun off a new, publicly traded company, Corteva, which currently holds Old DuPont (defined *infra*) as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities— including those relating to PFAS. Corteva does business throughout the United States, including in the Commonwealth.

19.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. (i.e, New DuPont), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours (defined *infra*), Old DuPont merged with Old Dow (defined

*infra*) and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in the Commonwealth.

20.     Defendant Dynax Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was used in the Commonwealth.

21.     Defendant E. I. du Pont de Nemours and Company (i.e., Old DuPont) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, and sold fluorochemicals and/or fluorosurfactants containing PFAS used to manufacture AFFF that was used in the Commonwealth.

22.     Defendant Kidde-Fenwal, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Kidde/Kidde Fire has designed, manufactured, marketed, and sold PFAS-containing AFFF used in the Commonwealth.

23.     Defendant National Foam, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products and is the successor-

in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam/Angus Fire has designed, manufactured, marketed, and sold PFAS-containing AFFF used in the Commonwealth.

24.     Defendant The Chemours Company is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Chemours has designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was used in the Commonwealth.

25.     Defendant Tyco Fire Products LP is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul has designed, manufactured, marketed, and sold PFAS-containing AFFF used in the Commonwealth.

26.     Defendants ABC Corporations 1 through 10, unknown at this time, are manufacturers of AFFF, manufacturers of PFAS-containing fluorochemicals and fluorosurfactants used to make AFFF, and/or distributors of AFFF Products that have resulted in injuries to the Commonwealth's natural resources, or otherwise share responsibility for such injuries. When these ABC Corporations are identified, they will be added by name.

## STATUTORY AND REGULATORY BACKGROUND

### A.  The Federal Safe Drinking Water Act

27.     The U.S. Congress enacted SDWA in 1974 to ensure that public water supply systems meet minimum national standards for the protection of public health. SDWA recognizes that states play an important part in administering and enforcing drinking water standards.

28.     If certain conditions are met, SDWA grants a state the "primary enforcement responsibility for public water systems." 42 U.S.C. § 300g-2. Massachusetts has met the statute's requirements and has received authorization from the U.S. Environmental Protection Agency ("EPA") to enforce SDWA, including regulations promulgated to implement SDWA (in Massachusetts, 310 C.M.R. §§ 22.00 et seq., hereinafter the "Drinking Water Regulations"). Accordingly, the Commonwealth is empowered under SDWA to enforce that statute, including Section 300i. *See* Approval of State Application for Primary Enforcement Authority, 42 Fed. Reg. 57157 (Nov. 1, 1977).

29.     Pursuant to SDWA, the Commonwealth is entitled to, among other things: (a) reimbursement of the costs incurred by Massachusetts Department of Environmental Protection ("MassDEP") to investigate violations of SDWA, and (b) injunctive relief necessary to address actual, and to prevent threatened, injuries to the Commonwealth's drinking water supplies, including any such injuries and threats that present an "imminent and substantial endangerment" to the health of the Commonwealth's residents, including the injuries caused or threatened by PFAS. *See* 42 U.S.C. § 300i(a).

30.     Because MassDEP has been delegated primary enforcement authority for the enforcement of SDWA and the Drinking Water Regulations, the Commonwealth, through the Attorney General, has authority to institute a civil action against Defendants pursuant to SDWA to remedy the PFAS contamination affecting and threatening the Commonwealth's drinking water and drinking water sources. *See* 42 U.S.C. §§ 300j-6, 300i.

31.     Pursuant to SDWA's savings provision, 42 U.S.C. § 300h-6(*l*), preserving all state law authorities that go beyond those provided under SDWA, the Commonwealth, through the

Attorney General, is also authorized to assert claims against Defendants pursuant to its statutory and common-law authorities.

32.    Thus, pursuant to 42 U.S.C. §§ 300i and 300j-8(e), in the case of an "imminent and substantial endangerment" to human health resulting from discharges of "a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water," the Commonwealth is authorized to institute a civil action under SDWA against any person who has "caused or contributed to the endangerment" of a public water system and in accordance with the Drinking Water Regulations.

### B.  The Commonwealth's Drinking Water Regulations

33.    The Commonwealth has set, in the Drinking Water Regulations at 310 C.M.R. § 22.07G(3)(d), its PFAS6 MCL of 20 ppt for the sum of the concentration of certain PFAS: PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA. The Commonwealth's drinking water standard was adopted and published on October 2, 2020, to protect against adverse health effects for all people consuming the water. The Commonwealth has also listed these PFAS as toxic and hazardous substances under the state Toxics Use Reduction Act, M.G.L. c. 21I. 301 C.M.R. § 41.03(13).

### C.  The Massachusetts' Consumer Protection Act

34.    Massachusetts' Consumer Protection Act, M.G.L. c. 93A ("CPA"), makes a person's use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. M.G.L. c. 93A, § 2(a). A "person" includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." *Id.* § 1(a). "Trade" and "commerce" includes, *inter alia*, "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of . . . any property, tangible or intangible, real, personal or mixed, . . . any contract of sale of a commodity for future delivery,

and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." *Id.* § 1(b). Massachusetts courts look to Section 5(a)(1) of the Federal Trade Commission Act for guidance in construing the CPA. *Id.* § 2(b).

36. 35. The CPA empowers the Attorney General to seek to enjoin deceptive acts or practices; obtain restitution for consumers; impose civil penalties; and recover reasonable investigation and litigation costs, including reasonable attorneys' fees. M.G.L. c. 93A, § 4.

36. The CPA also authorizes the Attorney General to "make rules and regulations interpreting the provisions of subsection 2(a) of this chapter." M.G.L. c. 93A, § 2(c).

37. The Attorney General has duly promulgated regulations that establish enforceable standards for whether conduct, terminology, or representations involve acts or practices in violation of M.G.L. c. 93A, § 2(a).

38. The Attorney General's regulations, at 940 C.M.R. § 3.02(2), prohibit any "statement or illustration . . . in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another."

39. The Attorney General's regulations, at 940 C.M.R. § 3.05(1), prohibit misrepresentations that "directly, or by implication, or by failure to adequately disclose additional relevant information, ha[ve] the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect," including as to "[the] manner or time of performance, safety,

strength, condition, or life expectancy of such product . . . or the utility of such product or any part thereof, or the benefit to be derived from the use thereof."

40.    The Attorney General's regulations, at 940 C.M.R. § 3.16, provide that an act or practice is a violation of M.G.L. c. 93A, § 2, if (1) it is oppressive or otherwise unconscionable in any respect, or (2) any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.

41.    For retail advertising, the Attorney General's regulations, at 940 C.M.R. §§ 6.03(1)–(2), assign "responsibility for truthful and nondeceptive advertising" to "sellers," who "shall not use advertisements which are untrue, misleading, deceptive [or] fraudulent . . . ."

42.    In this regard, the Attorney General's regulations provide that "[a]n advertisement as a whole may be unfair or deceptive although each representation separately construed is literally true," 940 C.M.R. § 6.03(3), and "[a]n unfair or deceptive representation may result not only from direct representations and the reasonable inferences they create, but from the seller's omitting or obscuring a material fact," 940 C.M.R. § 6.03(4).

43.    The Attorney General's regulations, at 940 C.M.R. § 6.04, provide that "[i]t is an unfair or deceptive act" for a seller to "make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading" and to "fail to clearly and conspicuously disclose in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers."

44.    The CPA provides that at least five days prior to the commencement of any action brought under Section 4 of the CPA, the Attorney General shall notify the person of her intended

action and give the person an opportunity to confer as to the proposed action. M.G.L. c. 93A, § 4. Such notice was provided to Defendants in this case.

45.     The CPA allows for civil penalties of up to $5,000 per violation and reasonable costs of investigation and litigation when the violator "has employed any method, act or practice which he knew or should have known to be in violation of said section two." M.G.L. c. 93A, § 4. For willful violations, the court may impose up to three but not less than two times that amount" to "restore any person who has suffered any ascertainable loss of any moneys or property, real or personal." *Id.*

**D.  The Massachusetts Uniform Fraudulent Transfers Act**

46.     The Commonwealth has adopted the Uniform Fraudulent Transfer Act, M.G.L. c. 109A ("UFTA"), to prevent the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets beyond their reach. The UFTA has been adopted in substantively identical form in many jurisdictions, including the State of Delaware. *See* Del. Code tit. 6, § 1301.

47.     Under the UFTA's actual fraudulent transfer provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. M.G.L. c. 109A, § 5(a)(1).

48.     The UFTA's constructive fraudulent transfer provision provides that a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due"; or (iii) "was insolvent at

the time or the debtor became insolvent as a result of the transfer or obligation." M.G.L. c. 109A, §§ 5(a)(2), 6(a).

## FACTUAL ALLEGATIONS

### A. Affected Natural Resources

49.     The residents of the Commonwealth "have the right to clean air and water" and "the natural, scenic, historic, and esthetic qualities of their environment." Mass. Const. amends., art. XCVII. The Commonwealth thus protects, as a "public purpose," each person's "right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources." *Id.*

50.     The Commonwealth's natural resources include its waters, such as springs, streams, wetlands, groundwater, ocean waters, and estuaries, within its boundaries or otherwise subject to its jurisdiction. They also include the Commonwealth's habitats and ecosystems—forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands—and the flora and fauna (animals such as birds and fish, and other biota)—that live in these habitats and ecosystems.

51.     These natural resources have been injured by past and ongoing contamination caused by PFAS attributable to AFFF Products.

52.     PFAS attributable to AFFF Products have been found in groundwater, surface water, sediments, and soils in the Commonwealth where AFFF Products were used. Further, the Commonwealth anticipates that additional contamination to natural resources from AFFF Products will be uncovered as investigation continues.

53.     Contamination from AFFF Products persists (i.e., it does not break down in the environment) in the Commonwealth's natural resources and damages their intrinsic (i.e., inherent existence) and use values.

54.    The current and future residents of the Commonwealth have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely upon maintaining a clean environment for their businesses, patrons, and tourists to visit and enjoy.

## Groundwater

55.    Groundwater is a critical ecological natural resource for the people of the Commonwealth, as the Commonwealth relies on groundwater for drinking, irrigation, and agriculture.

56.    Private wells and public water supply wells, which provide access to groundwater, are used in residential communities throughout the Commonwealth near, including but not limited to, military and industrial facilities, airports, and firefighting training academies where AFFF Products were used. The water from these wells is used for, *inter alia*, drinking, bathing, showering, cooking, dishwashing, and maintaining oral hygiene, as well as for irrigation, watering livestock, and filling swimming pools.

57.    In addition to serving as a source of water for drinking and for agricultural and other uses, groundwater is an integral part of the overall ecosystem in the Commonwealth. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems.

58.    Groundwater also promotes cycling and nutrient movement within and among the Commonwealth's bodies of water and wetlands, prevents saltwater intrusion, provides groundwater stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

59.    Groundwater and the Commonwealth's other natural resources are unique resources that help sustain the Commonwealth's economy.

60.     AFFF Products are a significant source of PFAS contamination in groundwater, which mobilize in and through groundwater sources to reach areas beyond the location of the AFFF Products' use. This contamination adversely affects the groundwater.

61.     Investigations in the Commonwealth have revealed elevated levels of PFAS in the groundwater.

62.     Investigation of contamination from AFFF Products in groundwater in the Commonwealth is ongoing.

### Surface Fresh Water

63.     Surface water is a critical ecological resource of the Commonwealth. The Commonwealth's surface water—which includes all water in the Commonwealth's rivers, lakes, streams, and wetlands—is a primary resource for generating drinking water for residents of the Commonwealth. Surface water, such as the Shawsheen River, have been contaminated by PFAS as a result of Manufacturer Defendants' AFFF products.

64.     Surface water in the Commonwealth is also used for recreational, industrial, agricultural, and other commercial purposes, including swimming, boating, and recreational fishing. The tourism, recreation, and fishing industries, which are dependent on clean water, are vital to the Commonwealth's economy. Surface water also provides aesthetic and ecological value, including by supporting aquatic ecosystems, nearby communities, and the residents of the Commonwealth.

65.     PFAS are mobile in water and can spread great distances from the point of discharge. PFAS contamination attributable to the use of AFFF Products in the Commonwealth has reached and adversely affected surface water throughout Massachusetts.

66.     Investigation of contamination from AFFF Products in surface water in the Commonwealth is ongoing.

## Coastal Resources & Estuaries

67.     The Massachusetts coastal zone ("Coastal Zone"), including without limitation Cape Cod, Cape Ann, Nantucket, Martha's Vineyard, and the Elizabeth Islands and their numerous estuaries, are critical to the people and the economy of the Commonwealth.

68.     Estuaries are partially enclosed bodies of water surrounding coastal habitats where saltwater from the ocean mixes with fresh water from rivers and streams within the Commonwealth.

69.     Estuaries provide habitat for many kinds of marine life and commercially important species. For example, shellfish, especially reef-forming species like oysters, play a critical role in the function of estuaries, improving water quality, providing habitat, and in some cases protecting the shoreline. Shellfish, such as oysters and clams, also are produced in commercial quantities within the Commonwealth and are an important contributor in many ways to the Commonwealth's economy.

70.     The use of AFFF Products at locations within the Coastal Zone, such as Joint Base Cape Cod, have resulted in PFAS contamination of the Coastal Zone, its estuaries, and surrounding lands. These coastal habitats and estuaries are one of the most imperiled marine habitats due to the contamination caused by AFFF Products and serve as long-term reservoirs of PFAS, where PFAS are stored and released over time, impacting the estuaries and increasing PFAS concentrations in the very cells and tissues of the shellfish and other wildlife that people eat.

71.     Investigation of AFFF Products-related PFAS contamination in the Coastal Zone, its estuaries, and surrounding lands in the Commonwealth is ongoing.

## Sediments, Soils, and Submerged Land

72.     The Commonwealth's sediments, soils, and submerged lands are critical components of the Commonwealth's complex ecological resources. Sediments, soils, and

submerged lands sustain a wide diversity of plants and animals that are essential to a healthy ecosystem. They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

73.     Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and increasing PFAS concentrations in fish tissue, other wildlife, and plants.

74.     PFAS contamination attributable to the use of AFFF Products in the Commonwealth has reached and adversely affected soil and sediment throughout Massachusetts. Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the Commonwealth. PFAS in sediments, as well as surface water, increase PFAS concentrations in fish.

75.     Investigation of contamination from AFFF Products in sediments, soils, and submerged lands in the Commonwealth is ongoing.

**<u>Biota</u>**

76.     Biota, including the Commonwealth's flora and fauna, are critical ecological resources. Massachusetts is home to more than three thousand plant species and subspecies, the highest number of species identified of any state in New England, including entire plant communities that include substantial numbers of rare flora. Massachusetts' wildlife includes hundreds of species, including mammal species, reptile and amphibian species, fish species, and bird species. Massachusetts' biodiversity provides valuable ecological, social, and economic goods and services and is an integral part of the ecological infrastructure for all cultural and economic activity in the Commonwealth.

77.     Contamination by pollutants is one of the major causes of biodiversity loss. There are 432 native species—173 species of animals and 259 species of plants—in Massachusetts that

are listed as endangered, threatened, or of special concern, meaning they are either at risk, or may become at risk, of extinction.

78.    Natural resource injuries to biota in the Commonwealth negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

79.    PFAS contamination attributable to Defendants' AFFF Products has reached and adversely affected biota in the Commonwealth.

80.    Investigation of AFFF Products-related contamination in biota in the Commonwealth is ongoing.

**B.  The Harmful Impacts of AFFF on the Environment and Human Health**

81.    AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

82.    When used as intended during a firefighting event or training exercise, AFFF Products can cause hundreds, if not thousands, of gallons of foamy water laced with PFAS to enter the environment in a variety of ways, including but not limited to, through soils, sediment, surface water, and groundwater.

83.    AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms. The carbon-fluorine bond is one of the strongest bonds in chemistry and imparts to PFAS their unique chemical properties. The carbon-fluorine bond in PFAS generally does not occur in nature.

84.     The PFAS family, including PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA, has characteristics that cause extensive and long-lasting environmental contamination.

85.     PFAS are mobile and persistent in the environment. Once introduced into the environment, PFAS quickly spread because they easily dissolve in water and, thus, have reached numerous water systems within the Commonwealth. PFAS also persist in the environment indefinitely because their multiple carbon-fluorine bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes. Similarly, removal of PFAS from drinking water sources require specialized, and expensive, drinking water treatment systems. In short, once PFAS are used, they migrate through the environment, resist natural degradation, contaminate groundwater and drinking water, and are difficult and costly to remove.

86.     PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are very slowly excreted from individual organisms, ongoing low-level exposure results in a buildup in body burden (i.e., levels of PFAS remaining within the body). Thus, they also can biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain. PFAS also are harmful to the environment and animal health.

87.     PFAS are toxic and cause significant adverse effects to human health. The presence of these chemicals in drinking water presents a serious threat to public health. For example, PFOS exposure is associated with numerous adverse health effects in humans, including increases in serum lipids (i.e., high cholesterol), decreases in antibody response to vaccines, increases in risk of childhood infections, and adverse reproductive and developmental effects, along with pregnancy induced hypertension and preeclampsia. And PFOA exposure is associated with many

of the same adverse health effects plus decreased birthweight, testicular and kidney cancers, ulcerative colitis, and thyroid disease.

**C. Manufacturer Defendants' History of Manufacturing and Selling AFFF Products**

88.    3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

89.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

90.    Arkema's predecessors supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spin-off from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

91.    At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

92.    From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

93.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. In its press release announcing the phase out, 3M stated "our

products are safe" and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention," and 3M did not reveal the risks to human health and environment posed by the chemicals of which it was aware.

94.     After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to grab a share of the AFFF market when 3M exited, although Old DuPont had decades of evidence that PFAS were highly toxic and dangerous in the environment.

95.     Manufacturer Defendants advertised, offered for sale, and sold AFFF Products to federal, state, and territory government entities, including the military, counties, municipalities, airports, fire departments, and/or other governmental or quasi-governmental entities, for use in the Commonwealth.

96.     3M's AFFF Products, created using an electrochemical fluorination process, contain PFAS. The remaining Manufacturer Defendants' AFFF Products, created using a telomerization process, contain or break down into PFOA. AFFF Products manufactured by Manufacturer Defendants other than 3M are fungible and lack traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant. Due to this fungibility, Manufacturer Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site. Any inability of the Commonwealth to identify the original manufacturer of the specific AFFF Products released into

the Commonwealth's natural resources in particular instances at particular sites is a result of the fungibility of the products and not as a result of any action or inaction by the Commonwealth.

97.     Manufacturer Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Manufacturer Defendants marketed their AFFF Products by promoting their long shelf life. Even after Manufacturer Defendants fully understood the toxicity of PFAS—and their deleterious impacts when released into the environment through use of AFFF Products exactly as they had marketed and intended for them to be used—Manufacturer Defendants concealed the true nature of PFAS. Even while Manufacturer Defendants phased out production or transitioned to other formulas, they did not advise their customers that they should not use AFFF Products that contained PFAS or otherwise reveal the dangers posed by the AFFF Products. Manufacturer Defendants further did not act to get these harmful products of theirs off the market. Manufacturer Defendants did not warn the Commonwealth or others that the use of AFFF Products with PFAS would harm the environment, endanger human health, or result in their incurring substantial costs to investigate and clean up groundwater contamination and damage to other natural resources.

98.     Accordingly, for many years after the original sale of AFFF Products that contained PFAS, these AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters of the Commonwealth, harming the environment and endangering human health. Manufacturer Defendants never advised their customers that they needed to properly dispose of their stockpiles of AFFF Products, nor instructed them how to properly dispose of AFFF Products.

**D. Manufacturer Defendants Knew, or If They Did Not Know, Should Have Known, That Their AFFF Products Containing PFOS, PFOA, and/or Their Precursors Were Harmful to the Environment and Human Health**

    **i.  3M knew, or should have known, of the harm caused by PFAS, and 3M attempted to suppress negative information about these chemicals**

99.    3M has known for decades that the PFAS contained in its AFFF are toxic and adversely affect the environment and human health.

100.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

101.    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

102.    As early as 1963, 3M knew that its PFAS products were highly stable in the environment and did not degrade after disposal.

103.    By the 1970s, 3M had become concerned about the risks posed to the general population by exposures to 3M's fluorochemicals.

104.    By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life. Around this time, 3M abandoned a study of its fluorochemicals because of the severe pollution of nearby surface water that was being caused by the company's release of the chemicals during the study.

105.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFOA—a scenario 3M discussed internally but did not share outside the company. This finding also alerted

3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in human blood.

106.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

107.    In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

108.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

109.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

110.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

111.    In 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

112.    Despite its understanding of the hazards associated with the PFAS in its products, 3M actively sought to suppress scientific research on the hazards associated with them and

mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

113.    At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

114.    3M engaged in a variety of tactics to deceive others and to hide the negative effects of PFAS. For example, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its PFOS, (2) 3M's submission of misinformation about its PFOS to EPA, (3) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

115.    Despite its knowledge of the risks associated with exposures to its PFAS products, when 3M announced it would phase out its PFOS, PFOA, and related products (including AFFF) in 2000, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

116.    3M knew, or should have known, that its AFFF, in its intended use, would release PFAS that would dissolve in water; reach water systems and the environment in the Commonwealth; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the Commonwealth due to their toxicity. Such knowledge was accessible to

3M, but not to the Commonwealth until 3M's acts and omissions came to light and the Commonwealth developed its own understanding of the toxicity of PFAS.

### ii.   The remaining Manufacturer Defendants knew, or should have known, of the harm caused by the release of PFOA from their AFFF Products

117.    The remaining (non-3M) Manufacturer Defendants knew, or should have known, that, in their intended and/or common use, their AFFF Products containing PFAS would harm the environment and human health.

118.    The remaining Manufacturer Defendants knew, or should have known, that their AFFF Products released PFAS that would dissolve in water; reach water systems and the environment in the Commonwealth; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the Commonwealth due to their toxicity.

119.    Information regarding PFAS was readily accessible to each of the remaining Manufacturer Defendants for decades, and since 2002 for Old DuPont, because each is an expert in the field of AFFF Products' manufacture and/or the PFAS-containing materials needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. The Commonwealth, by contrast, did not have access to such information.

### iii.   Old DuPont knew, or should have known, of the harms caused by PFOA, and it concealed its knowledge from regulators and users of AFFF Products

120.    Old DuPont began using PFOA and other PFAS in their specialty chemical productions applications, including household products, like Teflon®, in the 1950s and, quickly thereafter, developed an understanding of the dangers of using these chemicals.

121.    During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon®, which contains PFOA and other PFAS, and related industrial facilities emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of

thousands of people had been exposed to its PFAS, including via public and private drinking water supplies.

122.    Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

123.    In 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

124.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the Commonwealth, at that time.

125.    The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

126.    Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

127.    In fact, Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

128.    While Old DuPont knew about PFOA's toxicity danger as early as the 1960s, Old DuPont was also aware that PFAS was capable of contaminating the surrounding environment, leading to human exposure. No later than 1984, Old DuPont was aware that PFOA is biopersistent.

129.    Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's plant in West Virginia, Old DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

130.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

131.    In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

132.    Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, only entered the market for the sale of AFFF after 3M announced its phase out of PFOA and PFOS in 2000 (due to its knowledge of the compounds' toxicity and threats of further enforcement action by EPA). In 2008, Old DuPont literature is quoted in an article on AFFF in Industrial Fire World magazine, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

### iv.    Old DuPont worked in concert with other Manufacturer Defendants and the Firefighting Foam Coalition to protect AFFF Products from scrutiny

133.    The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Defendants"), among others in the industry, were members of the FFFC. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA and its precursors released from AFFF Products but did not share that information with the general public or government entities, including the Commonwealth.

134.    FFFC Defendants worked together to protect AFFF Products from scrutiny, including by coordinating their messaging on PFOA's toxicological profile and their AFFF Products' contribution of PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities learning the truth about the harms of PFOA to the environment and human health. FFFC Defendants regularly published newsletters promoting their AFFF Products, while also regularly attending trade group conferences to disseminate misleading messaging.

135.    FFFC Defendants' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal known risks of their AFFF Products and the PFOA and its precursors that they contained from the general public and government entities, including the Commonwealth, reflecting their express or tacit understanding to conceal such risks.

136.    FFFC Defendants repeated the same messaging for years to the effect that only one PFAS chemical, PFOS, had been taken off the market, and because FFFC Defendants' products did not contain PFOS, their products were safe.

137.    FFFC Defendants knew, however, that their messaging regarding their AFFF Products was false. Each of the FFFC Defendants knew that PFOA was released *directly into the environment* from the use of their AFFF Products and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Defendants knew this, it was not similarly understood by the public and government entities, including the Commonwealth.

**E.  AFFF Products Have Resulted in PFAS Contamination in the Commonwealth, Including Sources of Drinking Water, and Manufacturer Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources**

138.    The Commonwealth's natural resources have been contaminated with PFAS by the use of AFFF Products, and investigation of contamination is ongoing. Manufacturer Defendants'

designing, manufacturing, marketing, and selling of AFFF Products in the Commonwealth, including to the U.S. military, have been a substantial factor in causing PFAS contamination and its injuries to the natural resources of the Commonwealth. As investigation continues, additional locations are identified, and on- and offsite AFFF Products-related contamination is delineated, it is expected that significant further PFAS contamination from AFFF Products will be uncovered.

139.    Thus far, 126 drinking water systems in 86 communities in the Commonwealth are contaminated by PFAS, with many of these systems showing PFAS levels orders of magnitude higher than the PFAS6 MCL of 20 ppt.

140.    Although the contamination from Manufacturer Defendants' AFFF Products is widespread in the Commonwealth, the following three sites exemplify the variety and breadth of the contamination these products have caused in the Commonwealth: Hanscom Field/Air Force Base, Joint Base Cape Cod, and Stow's Former Fire Station.

141.    Hanscom Field/Air Force Base is located in Middlesex County within the Towns of Bedford, Lexington, Concord, and Lincoln. PFAS concentrations in excess of 44,000 ppt, several orders of magnitude above the PFAS6 MCL, have been detected in groundwater at Hanscom Field/Air Force Base. The Town of Bedford's Shawsheen Road Wellfield is located to the north/northeast of Hanscom Field/Air Force Base. That wellfield was taken offline in 2019 due to PFAS contamination from AFFF Products. The Shawsheen River and some of its tributaries run along the outskirts of Hanscom Field/Air Force Base. The Shawsheen River and its tributaries have been contaminated with PFAS from AFFF Products used at Hanscom Field/Air Force Base, including during firefighting exercises and a charter jet crash.

142.    Joint Base Cape Cod is located in Barnstable County, within the Massachusetts Towns of Bourne, Falmouth, Mashpee, and Sandwich. Joint Base Cape Cod is a 22,000-acre state-

federal military facility located over Cape Cod's sole source aquifer (Sagamore Lens) that provides drinking water for roughly 200,000 year-round and 500,000 seasonal residents of the Cape. Several PFAS contaminant plumes have been identified in groundwater at Joint Base Cape Cod, resulting from past use of AFFF Products at the base. The PFAS contaminant plumes have migrated off base and have impacted at least 22 private residential drinking water wells and five public water supply wells at levels exceeding the PFAS6 MCL. One of the PFAS contaminant plumes has reached dimensions of 1.5 miles long, 1300 feet wide, and 110 feet thick, and that plume has migrated to nearby natural resources, including downgradient surface water bodies that are used for cranberry bog farming and to Hen Cove and Red Brook Harbor, which are saltwater shell-fishing areas located in Buzzards Bay.

143.    PFAS-containing AFFF Products were used for training purposes at the former fire station in the Town of Stow, leading to widespread PFAS contamination of the groundwater. PFAS6 groundwater contamination has reached 33,412 ppt at the former fire station itself—more than a thousand times higher than the PFAS6 MCL of 20 ppt. These PFAS have also contaminated the public water supply wells at Stow's Hale Middle School, Stow Center School, and the Stow municipal offices, as well as nearby private water supply wells. PFAS6 was found in 192 of the 265 (72%) of the nearby private wells tested. Of those 192 private wells, 87 were above the PFAS6 MCL and 16 were above 90 ppt, therefore posing an imminent hazard to persons consuming the well water under Massachusetts regulations.

144.    As investigation of AFFF Products-related contamination continues, additional contamination areas will be discovered on a location-by-location basis. Such investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the natural

resources impacted to levels that are safe for human health and the environment and to the condition they were in prior to the impact of these contaminants.

145.    Manufacturer Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with PFAS from AFFF Products, as well as for the Commonwealth's loss of past, present, and future use of such contaminated natural resources.

146.    The PFAS contamination in groundwater and surface water is likewise impacting the Commonwealth's drinking water sources. Manufacturer Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water impacted by PFAS from AFFF Products in the Commonwealth.

147.    Moreover, the nature of the PFAS contamination renders it inherently opaque to detection and fails to provide the Commonwealth with notice of the harm until the contamination is known to exist above the PFAS6 MCL, whereby the discovery rule applies and tolls any applicable statute of limitations. Defendants' conduct of fraudulently concealing the toxic nature of their AFFF Products containing PFAS and of PFAS themselves similarly tolls any applicable statute of limitations because they sought to affirmatively conceal the harm caused by their products. And, as the contamination is continuing to this day, the continuing tort rule also tolls any applicable tort statute of limitations.

**F.    Old DuPont's Multi-Step, Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors**

148.    Old DuPont sought to insulate itself from billions of dollars of legacy environmental liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country, and these efforts have included

unlawful attempts to shield assets from liability for AFFF contamination, including liability for PFAS contamination in the Commonwealth.

149.    Old DuPont's potential cumulative liability related to PFOA and other PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades'-long attempt to hide the dangers of PFAS from the public.

150.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey and West Virginia, and at Fayetteville Works in North Carolina. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, like those in Massachusetts, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including PFAS-containing AFFF.

151.    For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination adjacent to Old DuPont's Washington Works plant in West Virginia, sued Old DuPont in West Virginia federal court.

152.    Old DuPont's in-house counsel was very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good

one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

153.    In 2005, after settling the Tennant case, Old DuPont settled claims by EPA for violations of TSCA and RCRA related to PFAS, as discussed in Paragraph 131 above. Also, in 2005, a West Virginia court entered a final order approving a 2004 settlement with Old DuPont of a class action lawsuit filed on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works. Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

154.    By 2012, after seven years of studies, the Science Panel confirmed "probable links" between class-member exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

155.    After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class

settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio. A number of trials were scheduled to take place in 2015 and 2016.

156.    Old DuPont must have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, and that its liability was likely billions of dollars.

157.    Anticipating this significant liability exposure, Old DuPont had convened an internal initiative known as "Project Beta" on or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

158.    In furtherance of possible restructuring opportunities, including potential merger structures, in or around 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals."

159.    However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

160.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

161.    Old DuPont engaged in a three-part restructuring plan, as described below.

162.    The first step in Old DuPont's plan was to transfer its performance chemicals business (which included Teflon® and other products) ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

163.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities and that Old DuPont still faced direct liability for its own conduct.

164.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

165.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

166.    The third step involved DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

167.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

168.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

169.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like the Commonwealth, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

170.    In greater detail, the restructuring was implemented as follows.

**Step 1: The Chemours Spinoff**

171.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

172.    On April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

173.    On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity.

174.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

175.    Prior to the Chemours Spinoff, Chemours's Board of Directors had three members, all of whom were Old DuPont employees.

176.    On June 19, 2015, a fourth member of the Board, who had served as a member of Old DuPont's Board of Directors from 1998 to 2015, was appointed.

177.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

178.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

179.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

180.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

181.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

182.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

183.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the Commonwealth here, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. The

Chemours Separation Agreement also required Chemours to assume billions of dollars of Old DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

184.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

185.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

186.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

187. In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

188. Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Court does not limit Chemours's liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

189. There was no meaningful, arms'-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

190. In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

191. Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as PFAS-containing AFFF, and in so doing, shield Old DuPont.

192. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its

"significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

193.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

194.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

195.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

196.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

197.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

198.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

### Step 2: The Old Dow/Old DuPont "Merger"

199.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

200.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

201.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

202.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

203.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed

DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

204.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

205.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

206.    The below image reflects the corporate organization following the "merger":



**Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

207.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and

"divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

208.    It is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

209.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

210.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

211.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

212.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



213.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

214.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

215.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

216.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

217.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the Commonwealth's claims in this case.

218.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The Commonwealth can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the Commonwealth's natural resources.

219.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

220.    On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

221.    Corteva now holds 100% of the outstanding common stock of Old DuPont.

222.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

223.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



224.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

**The Effect of the Years'-Long Scheme to Defraud the Commonwealth and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

225.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

226.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

227.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

228.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

229.    Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

230.    Also, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

231.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

232.     As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

233.     At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

234.     In addition, the Commonwealth's position is not protected by the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

235.     Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value.

236.     New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

237.     In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital, a private equity firm.

238.     On December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances, Inc., a manufacturer and supplier of flavors and fragrances used in the food, beverage, personal care, and household products industries, for $26.2 billion. That transaction closed in February 2021.

239.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron, a global maker of semiconductor wafers.

240.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

241.    Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

242.    The Chemours Spinoff constitutes a fraudulent transfer, which entitles the Commonwealth to, among other things, void the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and subsequent separations of New DuPont and Corteva likewise constitute fraudulent transfers that entitle the Commonwealth to, among other things, recover property and value transferred to New DuPont and Corteva.

## CAUSES OF ACTION

COUNT I:    PRODUCTS LIABILITY: IMPLIED WARRANTY OF MERCHANTABILITY-DESIGN DEFECT: UNIFORM COMMERCIAL CODE, M.G.L. C. 106, § 2-314 (ALL DEFENDANTS)

243.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

244.    Manufacturer Defendants designed, manufactured, marketed, and sold AFFF Products containing PFAS that were used in the Commonwealth during the relevant time period.

By doing so, Manufacturer Defendants impliedly warranted that their AFFF Products were merchantable, safe, and fit for ordinary purposes for which they were used.

245.    Manufacturer Defendants knowingly placed their AFFF Products that contained PFAS into the stream of commerce with full knowledge that they would be and were sold to end users in the Commonwealth.

246.    Manufacturer Defendants knew, or reasonably should have known, that their design, manufacture, marketing, and sale, as well as their customers' use, of AFFF Products in an intended or reasonably foreseeable manner, would result in the release of PFAS in the environment, including at various locations in the Commonwealth.

247.    Manufacturer Defendants' AFFF Products were defective in design and unreasonably dangerous because, among other things:

     i.    Manufacturer Defendants' AFFF Products cause extensive and persistent PFAS contamination of the Commonwealth's natural resources when used in a reasonably foreseeable and intended manner;

    ii.    PFAS released into the environment from Manufacturer Defendants' AFFF Products cause contamination in groundwater and surface water that are sources of drinking water and pose significant threats to public health and welfare; and

   iii.    Manufacturer Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS.

248.    Manufacturer Defendants' AFFF Products were in the same condition when they were purchased and/or used as they were when they left Manufacturer Defendants' control.

Manufacturer Defendants' customers used the AFFF Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

249.     As designers, manufacturers, marketers, and sellers of AFFF Products, Manufacturer Defendants had to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses and also to any person or property that might reasonably be expected to come into contact with those products.

250.     At all times relevant to this action, the AFFF Products that Manufacturer Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

251.     As a direct and proximate result of the defects in Manufacturer Defendants' design, manufacture, marketing, and sale of AFFF Products containing PFAS, groundwater, surface water, sediments, soils, estuaries, and other natural resources at and/or near the various sites throughout the Commonwealth where the AFFF Products were used have become contaminated with PFAS, causing the Commonwealth and its residents significant injury and damage.

252.     As a direct and proximate result of Manufacturer Defendants' acts and omissions, as alleged herein, the Commonwealth has incurred, is incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, sediment, soils, estuaries, and other natural resources at and/or near the various sites throughout the Commonwealth where Manufacturer Defendants' AFFF Products were used, for which damages Manufacturer Defendants are strictly, jointly, and severally liable.

253.     As a further direct and proximate result of Manufacturer Defendants' acts and omissions alleged in this Complaint, the Commonwealth has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and

expenses related to contamination of the air, drinking water, groundwater, surface water, sediments, soils, biota, estuaries, submerged lands, wetlands, and other natural resources at and/or near the various locations throughout the Commonwealth where Manufacturer Defendants' AFFF Products were used, for which costs and expenses Manufacturer Defendants are strictly, jointly, and severally liable.

254.     Based upon Manufacturer Defendants' understanding of their own products, it was reasonably foreseeable that the use of AFFF Products would contaminate soil, groundwater, drinking water, and other natural resources with PFAS and pose risks to human health. Nevertheless, Manufacturer Defendants marketed and sold their defective products as safe and fit for their ordinary purposes and failed to warn users of AFFF Products of the true risks associated with the foreseeable uses of such products.

255.     At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Manufacturer Defendants' AFFF Products containing PFAS outweighed the cost to Manufacturer Defendants of reducing or eliminating such risk.

256.     At all times relevant to this action, Manufacturer Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products, and the omission of such alternative designs rendered their AFFF Products not reasonably safe. While Manufacturer Defendants have recently transitioned to short-chain PFAS-based AFFF Products, which they claim are safer, they could have made this transition earlier. Moreover, AFFF Products can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

257.     Manufacturer Defendants acted with willful or conscious disregard for the rights, health, and safety of the Commonwealth's residents and the well-being of the Commonwealth's natural resources, thereby entitling the Commonwealth to an award of punitive damages.

258.     As described above, New DuPont and Corteva assumed Old DuPont's design defect liability.

**COUNT II:     PRODUCTS LIABILITY: IMPLIED WARRANTY OF MERCHANTABILITY-FAILURE TO WARN: UNIFORM COMMERCIAL CODE, M.G.L. C. 106, § 2-314 (ALL DEFENDANTS)**

259.     The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

260.     Manufacturer Defendants were required to warn end users and the Commonwealth of, *inter alia*, the dangers posed by their AFFF Products and the contamination that would result from their intended use.

261.     Manufacturer Defendants knew, or should have known, of the substantial risk of harm to human health and the environment from their AFFF Products containing PFAS, but they failed to warn, or inadequately warned of, *inter alia*, the likelihood that PFAS would be released into the environment during the normal use of Manufacturer Defendants' AFFF Products and of the widespread, toxic, and persistent effects of such releases. Manufacturer Defendants failed to provide such warnings to (i) users and buyers of their AFFF Products containing PFAS, (ii) the Commonwealth, and (iii) others to which it was reasonably foreseeable Manufacturer Defendants' AFFF Products would cause harm. To the extent Manufacturer Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by AFFF Products containing PFAS, and the warnings did not convey adequate information on the dangers of AFFF Products containing these chemicals to the mind of a reasonably foreseeable or ordinary user or bystander.

262.     Despite the fact that Manufacturer Defendants knew or should have known about the risks of AFFF Products containing PFAS, Manufacturer Defendants withheld such knowledge

from the Commonwealth, other government entities, and the public. Moreover, Manufacturer Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

263.    At no time relevant to this action did Manufacturer Defendants warn users and buyers of their AFFF Products, including the Commonwealth and others who it was reasonably foreseeable would be harmed by AFFF Products, that Manufacturer Defendants' AFFF Products would release PFAS into the environment during the products' normal use and of the widespread, toxic, and persistent effects of such releases.

264.    Had Manufacturer Defendants provided adequate warnings about the hazards associated with their AFFF Products containing PFAS, users and buyers, the Commonwealth, and others who it was reasonably foreseeable would be harmed by the AFFF Products would have heeded those warnings.

265.    As a direct and proximate result of Manufacturer Defendants' failure to warn of the hazards of AFFF Products containing PFAS, groundwater, surface water, sediments, soils, biota, and other natural resources at and around various locations throughout the Commonwealth where Manufacturer Defendants' AFFF Products were used have become contaminated with PFAS.

266.    As a direct and proximate result of Manufacturer Defendants' acts and omissions, the Commonwealth has incurred, is incurring, and will continue to incur in the future damages related to PFAS contamination in an amount to be proved at trial.

267.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage to the Commonwealth's natural resources.

268.    Manufacturer Defendants are strictly liable for all such injury and damage, and the Commonwealth is entitled to recover all appropriate damages and other relief.

269.    As described above, New DuPont and Corteva assumed Old DuPont's failure-to-warn liability.

COUNT III:    NEGLIGENCE (ALL DEFENDANTS)

270.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

271.    Manufacturer Defendants had a duty to the Commonwealth to ensure that PFAS were not released as a result of the use of their AFFF Products and did not injure drinking water, groundwater, surface water, sediment, soils, biota, estuaries, and other natural resources in the Commonwealth.

272.    Manufacturer Defendants had a duty to the Commonwealth to exercise due care in the research, design, formulation, handling, manufacture, marketing, sale, testing, labeling, use, distribution, promotion, and/or instructions for use of their AFFF Products containing PFAS.

273.    Manufacturer Defendants breached these duties in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, manufactured, marketed, sold, tested, labeled, used, distributed, promoted, and/or instructed for use of AFFF Products when they knew, or should have known, that PFAS would (i) be released into the environment, and (ii) be released and contaminate the Commonwealth's natural resources.

274.    Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, Manufacturing Defendants failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their AFFF Product information and/or instructions for use.

275.    As a direct and proximate result of Manufacturer Defendants' acts and omissions, the Commonwealth has suffered monetary losses and damages in amounts to be proven at trial, including but not limited to investigation, remediation, treatment, monitoring, and restoration, rehabilitation, acquisition of the equivalent of, and replacement costs and expenses for which Manufacturer Defendants are jointly and severally liable.

276.    As long as the Commonwealth's natural resources remain contaminated with PFAS due to Manufacturer Defendants' conduct, the harm to the Commonwealth continues.

277.    Manufacturer Defendants acted with willful or conscious disregard for the rights, health, and safety of the Commonwealth's residents and the well-being of the Commonwealth's natural resources, thereby entitling the Commonwealth to an award of punitive damages.

278.    As described above, New DuPont and Corteva assumed Old DuPont's negligence liability.

### COUNT IV:    MASSACHUSETTS CONSUMER PROTECTION ACT (ALL DEFENDANTS)

279.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

280.    CPA prohibits any person from engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce in the Commonwealth.

281.    Manufacturer Defendants are each a legal "person" that engages in trade or commerce. Users of AFFF Products are also persons who engage in trade or commerce.

282.    Manufacturer Defendants' conduct as alleged above constitutes unfair or deceptive acts or practices in their trade or commerce in Massachusetts, within the meaning of M.G.L. c. 93A, § 2, and as set forth in, among others, 940 C.M.R. §§ 3.02(2), 3.05(1), 3.16, 6.03(1)-(2), 6.03(3)-(4), and 6.04.

283.    Manufacturer Defendants' unfair or deceptive acts or practices were willful or knowing violations of M.G.L. c. 93A, § 2(a). Manufacturer Defendants violated M.G.L. c. 93A, § 2(a) by:

    i.    Selling AFFF Products to the Commonwealth's government entities, counties, municipalities, local fire departments, businesses, and residents despite knowing that use of the AFFF Products would result in PFAS contamination and, thus, burdening these entities with costs of investigation, and cleanup of existing stockpiles;

    ii.    Despite knowing the dangers associated with PFAS, withholding this knowledge from the Commonwealth's government entities, counties, municipalities, local fire departments, businesses, and/or residents, such that these entities did not understand the full consequences of their use of AFFF Products; and

    iii.    Deceptively claiming that their AFFF Products were safe and/or did not present a threat to the environment or human health.

284.    Manufacturer Defendants have also violated M.G.L. c. 93A, § 2 by making misrepresentations to Massachusetts customers including the Commonwealth, including but not limited to, representing that AFFF Products were safe and did not pose a threat to the environment or human health, when such was not the case.

285.    Manufacturer Defendants have also violated M.G.L. c. 93A, § 2 by engaging in the knowing omissions or concealments of material facts, including but not limited to:

    i.    Omitting or concealing material facts regarding the mobile, persistent, bioaccumulative, and toxic nature of PFAS; and

      ii.     Omitting or concealing material facts regarding the effect of using Manufacturer Defendants' AFFF Products on the environment and human health.

286.    Manufacturer Defendants' misrepresentations and omissions regarding the AFFF Products were and are material to the purchase of the AFFF Products in the Commonwealth.

287.    Each unfair commercial practice and/or act of deception, misrepresentation, and/or knowing omission of fact by Manufacturer Defendants constitutes a separate violation of the CPA.

288.    The Commonwealth suffered monetary damages as a result of Manufacturer Defendants' unfair and/or deceptive acts or practices declared unlawful by M.G.L. c. 93A, § 2(a) or by rule or regulation issued under M.G.L. c. 93A, § 2(c).

289.    The Commonwealth is thus entitled to treble damages and civil penalties of $5,000 from each Defendant for each violation of the CPA. M.G.L. c. 93A, § 4.

290.    The Commonwealth also is entitled to its reasonable investigation and litigation costs, including its attorneys' fees, as well as disgorgement of Defendants' ill-gotten gains.

291.    The Commonwealth provided Defendants with the required notice at least five days before the commencement of this suit.

292.    As described above, New DuPont and Corteva assumed Old DuPont's CPA liability.

**COUNT V:    PUBLIC NUISANCE (ALL DEFENDANTS)**

293.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

294.    A public nuisance is an unreasonable interference with the exercise of a public right by directly encroaching on public property or by interfering with the public health, peace, comfort, or convenience. Manufacturer Defendants' acts and omissions related to their AFFF Products have caused PFAS contamination at various locations throughout the Commonwealth, which were

inappropriate, harmful to, and inconsistent with the uses of those locations, leading to an unreasonable interference to the public in those areas and the creation of a public nuisance.

295.    Manufacturer Defendants knowingly created this public nuisance. Manufacturer Defendants marketed their AFFF Products to their customers knowing AFFF Products—exactly as marketed for intended use—would release PFAS into the environment. Further, well after Manufacturer Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFAS in the environment, Manufacturer Defendants never instructed their customers or the Commonwealth to stop using the AFFF Products in their possession or that they needed to specially use or handle the AFFF Products so as to not further contaminate the natural resources of the Commonwealth. Thus, Manufacturer Defendants could have avoided some or all of the damages caused by the AFFF Products if they had complied with the law.

296.    As a result, Manufacturer Defendants' AFFF Products have caused and continue to cause PFAS contamination of the Commonwealth's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, drinking water, groundwater, other natural resources, and property held in trust or otherwise owned by the Commonwealth, rendering these natural resources unfit for their uses in whole or in part.

297.    Manufacturer Defendants' acts and omissions affect a substantial number of people—the community at large—who use these trust resources for commercial, subsistence, passive use, and recreational purposes—and interfere with the rights of the general public to clean and safe natural resources and the environment, including but not limited to the right to safe, uncontaminated drinking water.

298.    The Commonwealth is entitled to the full use and enjoyment of the natural resources it holds in trust for its residents. These natural resources include, among others, air, soil,

sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, and drinking water of the Commonwealth. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public. The Commonwealth and its residents have been deprived of the use and enjoyment of these natural resources by Manufacturer Defendants' acts and omissions. Likewise, the Commonwealth's lands have been contaminated, causing the Commonwealth property and economic damages.

299.    The gravity of the environmental and human health risks created by Manufacturer Defendants' conduct and their concealment of the dangers to human health and the environment far outweigh any social utility of Manufacturer Defendants' conduct.

300.    As long as the Commonwealth's natural resources remain contaminated with PFAS due to Manufacturer Defendants' conduct, this public nuisance continues.

301.    Until these natural resources are restored, Manufacturer Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the people's common right to clean natural resources in the Commonwealth.

302.    Manufacturer Defendants are liable and subject to injunctive relief prohibiting the creation and continuance of said nuisance, and the Commonwealth is entitled to all direct and consequential damages from that nuisance. Manufacturer Defendants also are liable for any other relief that will abate and remediate the nuisance and its short-term and long-term effects.

303.    As described above, Corteva and New DuPont assumed Old DuPont's nuisance liability.

**COUNT VI:    TRESPASS (ALL DEFENDANTS)**

304.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

305.    Trespass is an unprivileged, intentional intrusion on land in the possession of another, which may arise from the release of chemicals causing contamination of the property.

306.    At all pertinent times, the Commonwealth held in trust or otherwise owned land in Massachusetts contaminated by Manufacturer Defendants' AFFF products, which caused and continue to cause PFAS contamination of the Commonwealth's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the Commonwealth.

307.    At all times relevant to the present cause of action, Manufacturer Defendants, as designers, manufacturers, marketers, and sellers of AFFF Products containing PFAS, provided the AFFF products that were used throughout the Commonwealth, including on land owned by the Commonwealth, that resulted in the contamination of air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the Commonwealth.

308.    Manufacturer Defendants affirmatively, voluntarily, and intentionally provided AFFF Products to entities in the Commonwealth while having had good reason to know or expect that large quantities of PFAS would and/or could be introduced into the Commonwealth's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the Commonwealth.

309.    Manufacturer Defendants' acts or omissions caused PFAS to be released into the Commonwealth's natural resources, thereby contaminating and injuring these resources.

310.    Manufacturer Defendants thus have trespassed, and are liable for all damages from that trespass, and the Commonwealth is entitled to recover all such damages and other relief.

311.    As described above, Corteva and New DuPont assumed Old DuPont's trespass liability.

**COUNT VII:    FEDERAL SAFE DRINKING WATER ACT CLAIMS: 42 U.S.C. §§ 300F ET SEQ. (ALL DEFENDANTS)**

312.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

313.    SDWA authorizes the Commonwealth to "take such actions as [it] may deem necessary" in order to protect the health of the Commonwealth's residents if it possesses "information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water . . . may present an imminent and substantial endangerment to the health of persons." 42 U.S.C. § 300i.

314.    The PFAS contamination of drinking water throughout the Commonwealth presents an imminent and substantial endangerment to human health within the meaning of 42 U.S.C. § 300i.

315.    EPA has delegated authority to the Commonwealth to act as the primacy agency for the enforcement of SDWA in the Commonwealth. Approval of State Application for Primary Enforcement Authority, 42 Fed. Reg. 57157 (Nov. 1, 1977).

316.    The Commonwealth may "commenc[e] a civil action" against any person who violates SDWA. 42 U.S.C. § 300i(a).

317.    Manufacturer Defendants are each a "person" within the meaning of SDWA.

318.    Manufacturer Defendants violated and are violating SDWA by engaging in activities that have caused or contributed to an imminent and substantial endangerment to the health of the Commonwealth's water users, whose drinking water contains PFAS in excess of the PFAS6 MCL. *See* 42 U.S.C. § 300i(a). These activities and the endangerment they created also

violate Commonwealth's Drinking Water Regulations, 310 C.M.R. §§ 22.00 et seq., including the PFAS6 MCL.

319.    Manufacturer Defendants are thus subject to liability under SDWA for appropriate injunctive relief and civil penalties.

320.    As described above, New DuPont and Corteva assumed Old DuPont's SDWA liabilities.

### COUNT VIII: ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE CHEMOURS SPINOFF (OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)

321.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

322.    Under the UFTA's actual fraudulent transfers provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. M.G.L. c. 109A, § 5(a)(1).

323.    Under the UFTA, a "creditor" is "a person who has a claim." M.G.L. c. 109A, § 2. A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* The Commonwealth is and was a creditor of Chemours at all relevant times.

324.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

325.    The Chemours Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

326.    At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

327.    Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

328.    The Commonwealth has been harmed as a result of the Chemours Transfers.

329.    Under the Massachusetts Uniform Fraudulent Transfer Act, M.G.L. c. 109A and Del. Code tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

330.    As described above, Corteva and New DuPont apparently assumed Old DuPont's actual fraudulent transfer liability.

**COUNT IX:   CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE CHEMOURS SPINOFF (OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)**

331.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

332.    Under the UFTA's constructive fraudulent transfer provision, a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due"; or (iii) "was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." M.G.L. c. 109A, §§ 5(a)(2), 6(a).

333.    The Commonwealth is and was a creditor of Chemours at all relevant times.

334.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

335.    Each of the Chemours Transfers and Chemours's assumption of the Assumed Liabilities was made to benefit, or for the benefit of, Old DuPont.

336.    At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

337.    Chemours made the Chemours Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

338.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

339.    At the time that the Chemours Transfers were made and Chemours assumed the Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

340.    The Commonwealth has been harmed as a result of the Chemours Transfers.

341.    Under M.G.L. c. 109A and Del. Code tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

342.    As described above, Corteva and New DuPont apparently assumed Old DuPont's constructive fraudulent transfer liability.

**COUNT X:    ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT RESTRUCTURINGS, ASSET TRANSFERS, AND SEPARATIONS (OLD DUPONT, NEW DUPONT, AND CORTEVA)**

343.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

344.    The Commonwealth is and was a creditor of Old DuPont at all relevant times.

345.    Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

346.    The Old DuPont Transfers were made for the benefit of New DuPont and/or Corteva.

347.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

348.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors, including the Commonwealth.

349.    The Commonwealth has been harmed as a result of the Old DuPont Transfers.

350.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Commonwealth that have been damaged as a result of the actions described in this Complaint.

351.    Under M.G.L. c. 109A and Del. Code tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

352.    The Commonwealth also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale

of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and a constructive trust over such proceeds for the benefit of the Commonwealth.

COUNT XI:    CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT RESTRUCTURINGS, ASSET TRANSFERS, AND SEPARATIONS (OLD DUPONT, NEW DUPONT, AND CORTEVA)

353.    The Commonwealth realleges and incorporates by reference the averments of the preceding paragraphs.

354.    The Commonwealth is and was a creditor of Old DuPont at all relevant times.

355.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

356.    Each of the Old DuPont Transfers was made to benefit, or for the benefit of, New DuPont and/or Corteva.

357.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

358.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

359.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

360.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

361.    The Commonwealth has been harmed as a result of the Old DuPont Transfers.

362.    Under M.G.L. c. 109A and Del. Code tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

363.    The Commonwealth also is entitled to have the Court enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and a constructive trust over such proceeds for the benefit of the Commonwealth.

## REQUEST FOR RELIEF

WHEREFORE, the Commonwealth asks that this Court:

A.    Find Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination resulting from Manufacturer Defendants' AFFF Products so the contaminated natural resources are restored to their original condition, or are replaced by reasonably equivalent resources, and for all damages to compensate the residents of the Commonwealth for the lost use and value of these natural resources during all times of injury caused by PFAS and for such orders as may be necessary to provide full relief to address the threat of contamination to the Commonwealth, including the costs of:

      i.    Assessment of PFAS-related contamination and natural resources at and around where Manufacturer Defendants' AFFF Products were used, including oversight costs;

      ii.    Past and future investigation, testing, treatment, and remediation of all AFFF-related contamination at sites where Manufacturer Defendants' AFFF Products were used and which contain detectable levels of PFAS restored to nondetectable levels, including the Commonwealth's oversight costs; and

iii.    Future monitoring of the sites and the Commonwealth's natural resources where Manufacturer Defendants' AFFF Products were used as long as there is a detectable presence of PFAS and restoration of such natural resources to their pre-contamination condition, including the Commonwealth's employees' time and associated costs.

B.    Order Defendants to pay for all other damages sustained by the Commonwealth in its sovereign, *parens patriae*, public trustee, and other capacities as a direct and proximate result of Defendants' acts and omissions alleged herein.

C.    Order Defendants to reimburse the Commonwealth for its costs of responding to PFAS contamination, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the Commonwealth's natural resources, including the Commonwealth's oversight costs, resulting from Manufacturer Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition.

D.    Order Defendants to pay treble damages and a civil penalty of $5,000 per violation under the CPA.

E.    Compel Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the Commonwealth's natural resources, including the Commonwealth's oversight costs, resulting from Manufacturer Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition.

F.    Order Defendants to pay restitution to the Commonwealth.

G.    Order Defendants to disgorge all ill-gotten gains.

H.     Order Defendants to pay exemplary or punitive damages as the trier of fact deems just and proper.

I.     Order Defendants to pay the Commonwealth's investigation and litigation fees and costs, including attorneys' fees and court costs.

J.     Void the Chemours Transfers and to recover property and value transferred to Old DuPont.

K.     Void the Old DuPont Transfers and to recover property and value transferred to New DuPont.

L.     Void the Old DuPont Transfers and to recover property and value transferred to Corteva.

M.     Enjoin New DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont.

N.     Enjoin Corteva, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont.

O.     Impose a constructive trust over the proceeds of the Old DuPont Transfers to Chemours for the benefit of the Commonwealth.

P.     Impose a constructive trust over the proceeds of the Old DuPont Transfers to New DuPont for the benefit of the Commonwealth.

Q.     Impose a constructive trust over the proceeds of the Old DuPont Transfers to Corteva for the benefit of the Commonwealth.

R.     Grant the Commonwealth all other relief to which it is entitled.

This is the 25th day of May 2022.


**COMMONWEALTH OF MASSACHUSETTS**

MAURA HEALEY
ATTORNEY GENERAL


NANCY E. HARPER                          _/s/ William J. Jackson_____
Assistant Attorney General and Chief,    WILLIAM J. JACKSON
Environmental Protection Division        JOHN D.S. GILMOUR
I. ANDREW GOLDBERG                       Special Assistant Attorneys General
LOUIS DUNDIN                             KELLEY DRYE & WARREN LLP
JILLIAN RILEY                            515 Post Oak Blvd., Suite 900
Assistant Attorneys General              Houston, TX 77027
OFFICE OF THE ATTORNEY GENERAL           (713) 355-5000
One Ashburton Place, 18th Floor          (713) 355-5001 (facsimile)
Boston, Massachusetts 02108              bjackson@kelleydrye.com
(617) 727-2200                           jgilmour@kelleydrye.com
(617) 727-9665 (facsimile)
betsy.harper@mass.gov
andy.goldberg@mass.gov
louis.dundin@mass.gov
jillian.riley@mass.gov